JAMES ELLIOTT, APPELLANT, V. WILLIAM BRANDT, JR.,
APPELLEE.

83 N. W. 2d 767

Filed June 14, 1957. No. 34117.

*Francis M. Casey, Healey, Davies, Wilson & Barlow,*
and *Kenneth Cobb,* for appellant.

*Smith & Lebens, Emory P. Burnett,* and *Van Pelt,*
*Marti & O'Gara,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE,
YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action for damages brought in the district
court for Cass County by James Elliott, plaintiff, for
injuries alleged to have been sustained by him as the
result of an assault and battery committed upon his
body by William Brandt, Jr., defendant. The case was
tried to a jury resulting in a verdict for the defendant.
The plaintiff filed a motion for new trial. From the
order overruling the motion for new trial, the plaintiff
appealed.

The plaintiff's petition alleged in substance that on.

or about the evening of September 18, 1953, the defendant unlawfully and without sufficient provocation committed assault and battery upon the body and person of the plaintiff resulting in injuries to him.

The defendant's answer alleged in substance that the plaintiff, without provocation, did unlawfully assault and willfully and maliciously strike and wound the defendant with his fist, and unlawfully threatened the defendant with serious injury with a club; that whatever injuries the plaintiff received were by reason of necessary defense made by the defendant while he was lawfully defending himself from said assault and while he was lawfully upon his own property; that in November 1949, in the city of Plattsmouth near the public library in said city, the plaintiff, without provocation unlawfully, willfully, and maliciously struck the defendant in the face and threatened to beat the defendant; and that on other occasions the plaintiff, without provocation, abused the defendant and attempted to provoke an assault, which assault and threats had all been made prior to September 18, 1953, and which had been communicated to the defendant. The answer further alleged that at the time of the unlawful assaults and threats made by the plaintiff on September 18, 1953, the defendant used only such force in repelling the assaults as he believed to be necessary to resist the same and for his protection and defense. The answer denied all other allegations pleaded in the plaintiff's petition.

The plaintiff's reply to the defendant's answer was a general denial.

For convenience we will refer to the parties as they were designated in the district court and on occasions to the plaintiff, James Elliott, as Elliott, and the defendant, William Brandt, Jr., as Brandt.

The record discloses that Elliott lives on a farm 5 miles northeast of Avoca and has resided there since 1942. His farm is located north across the road from

the farm of Brandt. There is a county road extending east and west between these farms. The east-west county road was newly graded but not rocked at the time of the fight on September 18, 1953, and the fences on both sides of the road were down. Brandt has lived on his present farm since 1944. At the time of the fight Elliott was 59 years of age, was nearly 6 feet tall, and weighed 210 pounds. Brandt weighed 180 pounds, was 5 feet 8 inches tall, and was 40 years of age.

About 6 p.m., Elliott drove west on the county road which divides his farm and the Brandt farm for the purpose of putting in some fence. He stopped his truck 30 rods west of his driveway where the fence was out. This was at a point near a fill and culvert that runs into the Brandt land. The road had been freshly graded, there was but a single track, and the surface was of soft dirt. He also wanted to inquire of Brandt about putting rock on the road. He got out of the truck close to the center of the fill about where the culvert that leads into Brandt's farm was located. Brandt was putting a wire on the second brace post from the east. He talked to Brandt about putting rock on the road. They both knew it would cost $150 to do so. Brandt told him that he was "hard up," did not have any money, and was not interested in putting rock on the road except from his mail box to the highway which did not include the county road in question. Elliott testified that about that time Brandt came out into the road after him and acted as though he was going to strike him. Elliott did not know if Brandt hit at him. He testified that Brandt turned around and went back to the post upon which he was working; that he came back and "hit me or something"; and that then the fight really started. Elliott testified that the next he remembered he was down on the ground but still on the culvert. Brandt was trying to throw dirt in his face and eyes and trying to twist Elliott's arm behind him.

The next thing Elliott remembered was that he was back in the middle of the road behind the truck. His upper plate was broken and he was bleeding at the mouth. He took his plate out and put it in his pocket, and Brandt started at him again. The truck had gone down the hill a distance of about 30 feet and stopped. Elliott was having difficulty seeing at that time as he had a cut across his eye, on the side of his head, and across one of his ears, and was bleeding badly. The truck was stuck in the loose dirt. Brandt was unable to back it up. He offered to get the tractor to pull the truck out. Elliott got in the truck and started the motor. Brandt got hold of him around the neck and tried to pull him out of the truck. Brandt finally let loose and told Elliott to get over, that he would drive. Brandt drove the truck to his home over Elliott's protest. A doctor was called to attend him. Elliott also testified that while he was at Brandt's home, Brandt's wife accused him of lying; and Brandt took hold of him, shook him, and he fell to the ground.

The evidence adduced in behalf of Brandt was to the effect that before September 18, 1953, Elliott threatened and attacked him in front of the library at Plattsmouth in November 1949. There was a meeting at the library with reference to selecting a committee for redistricting schools. After the meeting, Brandt came out of the basement of the library and Elliott was standing on the sidewalk. Brandt was talking to a Mr. Althouse who was inquiring about the difficulty in Brandt's school district. At that time Elliott struck him in the face. Brandt said: "Well, * * * if you feel better, why, go ahead and hit me again, if you want to." Elliott struck Brandt again. Brandt told Elliott to "go ahead and get it all out of your system," and started down the street. Elliott said: "No, * * * you goddam little runt, * * * we are going to catch you at home sometime and we are going to beat all the hell out of you then." At that time Brandt was walking toward

his car. On September 18, 1953, Brandt was building a fence on the north side of his farm. About 6 p.m., he saw Elliott coming from the east down to where he was working. Elliott stopped his truck just north of where he was, with the back of the truck about even with the west end of the culvert. There was a ditch approximately 3 to 3½ feet deep on both sides of the culvert. Elliott got out of the truck. At that time Brandt was working on the south side of two fence posts on his own land. Elliott came across the fill, and when he got within 6 or 7 feet of Brandt he said: "I see you are getting your fence back in, * * *." Brandt said "Yes." Then something was said about fixing a hole down at the bridge. Then Elliott told Brandt the road was ready to rock, and asked him what he was going to do about it. Brandt said he was "hard up," didn't have much money, and asked Elliott which road he meant. Elliott pointed out the county road to him. Brandt told Elliott that he was interested in paying for putting rock on the road only from his driveway to the highway. Elliott came closer to where Brandt was working on the fence and said: "That's just the kind of a goddamn son-of-a-bitch you always have been, * * * the only one you ever think of is Bill Brandt." Brandt told him that was not true, and he should take it back. Elliott said he would not take it back. Elliott told Brandt to come out where he was and he would show him what was going to happen to him. Brandt told Elliott to go home and mind his own business, that he was tending to his. Elliott told Brandt he was out in the road and did not have to go home. Elliott then struck Brandt in the face and started around the fence after him. They met and exchanged three or four blows apiece. Then Elliott left and went back across the fill. Brandt believed the fight was over and Elliott was going back home. Elliott walked rapidly across the fill, reached into the back of his truck, and got out two boards. As he started back across the

fill, he dropped one of them. He had the other in his right hand, raised it, and struck at Brandt. As he did so, Brandt grabbed the board, jerked it out of Elliott's hand, and threw it down beside the fence. Brandt told Elliott if they were going to have to fight "let's fight it fair." Then Elliott made a dive for Brandt's wagon which was near where he was working and where he had the tools and equipment. Brandt grabbed Elliott around the neck and held onto the brace fence post until Elliott overpowered him. Elliott pushed Brandt into the ditch, and while he was in the ditch threw big chunks of dirt 7 or 8 inches in diameter at him. One chunk of dirt hit Brandt and peeled the skin off one side of his face. Elliott left and was trying to get back to his truck. They engaged in more fighting. Brandt struck Elliott in the face, trying to keep him from getting to the back end of his truck One time Elliott asked Brandt to stop and rest. Brandt said "let's stop the thing altogether," but Elliott kept hitting Brandt. Shortly after that Elliott said he had broken his upper plate. The fight stopped until Elliott had removed his denture and put it in his pocket. The fight continued with Elliott trying to kick Brandt in the groin. Brandt struck Elliott in the jaw and he went down on his hands and knees. Brandt said to Elliott: "Let's stop," but Elliott got up and "just bulled" into Brandt, shoved him against the back end of the truck, and overpowered him. There were two hammers in the back of the truck which Brandt thought Elliott was trying to reach. During the time Brandt was trying to get his footing, he was pushed against the back of the truck causing it to roll down the road on the soft ground where it stopped near the ditch. Elliott said: "Well, I am just so sick, * * * I've just got to sit down and rest." Brandt said that suited him fine, he wanted to quit too. That was the end of the fight. Brandt further testified that Elliott struck the first blow, hitting him in the face; that neither of them were knocked out or knocked down

during the fight; and that the fight lasted about 15 to 20 minutes, until the truck rolled down the hill. Brandt further testified that Elliott did not hit him with a club, but attempted to do so; that during the fight he had in mind and believed that Elliott was attempting to carry out the threat he made in November 1949; and that he was afraid of Elliott and afraid for his life.

The plaintiff's wife testified by deposition in his behalf as a part of the plaintiff's case-in-chief. She testified that prior to September 18, 1953, the time of the fight in question, her husband had difficulty with Brandt about the road. Her husband claimed that Brandt's fence was located beyond his land and on the road. It appears that this trouble occurred some years prior to September 18, 1953. She further testified about her husband and Brandt having difficulty over school matters.

The sheriff of Cass County testified that after the attack made on Brandt by Elliott near the public library in Plattsmouth, Brandt came to see him and they discussed the attack. Brandt told the sheriff he would go home and talk to his wife about the matter and contact the sheriff later. Two days thereafter Brandt called the sheriff and informed him that the matter had not been settled, and requested the sheriff to come to his place. The sheriff went to Elliott's house and got Elliott, then drove to Brandt's home where they had a discussion about the occurrence at the library. Elliott denied that he had struck Brandt or threatened him. Brandt then told the sheriff again about the blows and about fearing Elliott, and there was a discussion about having Elliott put under a peace bond. The next day Elliott and his attorney, the county attorney, and Brandt were all present at the sheriff's office. At that time Elliott admitted striking Brandt twice when he was in front of the library and threatening him near the library. Brandt then agreed not to file charges against Elliott or put

him under peace bond. There is some testimony that plaintiff's counsel, as well as the county attorney and the sheriff, endeavored to bring Elliott and Brandt together, and after the admissions were made by Elliott, Brandt did shake hands with him, but thereafter neither Brandt nor Elliott had anything to do with each other.

The plaintiff's assignments of error necessary for a determination of this appeal may be stated as follows: (1) The trial court erred in submitting to the jury the issue of the plaintiff's violent disposition when the same was not pleaded, nor was any evidence introduced to support this issue; (2) the trial court erred in allowing the introduction in evidence of a threat of physical violence of the plaintiff to the defendant when the same was made at an unreasonable length of time before this incident; and (3) the trial court erred in permitting the defendant to testify over objection that he used no more force than was necessary to defend himself.

Before determining the plaintiff's assignments of error, we consider the following.

The defendant contends that the failure of the plaintiff to predicate error on the trial court overruling his motion for new trial presents nothing on which a reversal could be based. The defendant's contention is that the plaintiff has abandoned the appeal from such order and as a consequence there are no assignments of error to be considered by this court.

The function of a motion for new trial is to call the trial court's attention to alleged errors committed during the course of the trial. The trial court considers the separate assignments of error contained in the motion for new trial, which are generally in accordance with the statute, and determines whether or not, in its judgment, error was committed, and rules accordingly. From this final order an appeal may be taken to this court. The party appealing sets forth in appellant's brief the assignments of error alleged to have been committed by the trial court during the course of the

trial. This court reviews such assignments of error to determine whether they, or any of them, are meritorious and require a reversal of the trial court's judgment. There is no requirement in this jurisdiction that the party appealing predicate error on the overruling of the motion for new trial. The defendant's contention is without merit.

We consider the plaintiff's first two assignments of error together. In this connection, the plaintiff makes reference to the defendant's answer dealing with the allegation as to the assault made on the defendant by the plaintiff in November 1949. The plaintiff asserts that the evidence shows that from and after November 1949, the plaintiff and defendant were still neighbors, lived across the road from each other and saw each other frequently, and no blows were exchanged between them from the time of the incident in 1949 up to the time of the fight in 1953; and that on several occasions the plaintiff and defendant would be working in their respective fields alone, and there were no threats, blows, or threats of violence during this period of time. There is a conflict in the evidence as to the assertion made by the plaintiff as will appear later in the opinion.

The plaintiff also directs attention to instruction No. 11 given by the trial court as being prejudicially erroneous for the reason that it raises two issues, the violent disposition of the plaintiff toward the defendant and the general violent disposition of the plaintiff, which were not raised in the pleadings; that there is no evidence of the general character for violence of the plaintiff, or any evidence in regard to the plaintiff's character; and that in considering the conduct of the parties toward each other since the incident in 1949, the plaintiff contends that one specific act of violence is not sufficient to sustain an instruction on the general violent disposition of the plaintiff.

Instruction No. 11 reads as follows: "In determining the question of the reasonableness of the action or actions

of the defendant in the premises, you should take into consideration the excitement of the occasion, if any such is proved by the evidence, the previous violent conduct of the plaintiff towards the defendant, if any such is proved, *the information of the defendant touching the violent disposition of the plaintiff,* if any such is proved, and whether the defendant in good faith believed and acted upon such information, and, from a full, fair and candid consideration of all the evidence and facts and circumstances proved on the trial, determine whether the defendant acted as a reasonable man would under the same circumstances." (Emphasis supplied.)

The plaintiff cites Trousil v. Bayer, 85 Neb. 431, 123 N. W. 445, as follows: "Defendant also complains of the refusal of the court to admit testimony as to specific acts of the plaintiff for the purpose of proving that he was of a quarrelsome and contentious disposition. But proof of this nature must be as to general reputation, and not as to specific acts. Golder v. Lund, 50 Neb. 867."

The plaintiff also cites Carleton v. State, 43 Neb. 373, 61 N. W. 699. This was a first degree murder case. The general rule was stated, in substance, as follows: When character is in issue the proof must be of general reputation, not of specific acts, and not by proving the opinion of the witness based on his own observation as to the general character of the person in question. See, also, Daggs v. St. Louis-San Francisco Ry. Co. (Mo. App.), 51 S. W. 2d 164; Cummins v. Crawford, 88 Ill. 312, 30 Am. R. 558.

We are not in accord with the plaintiff's contention insofar as the instant case is concerned. The pleadings in the instant case put in issue the question as to who started the fight. In the light of the pleadings, any competent evidence offered by the defendant is admissible to prove his claim that the plaintiff started the fight and that the defendant acted only in self-defense. There were no witnesses to this fight. We believe, under the cir-

cumstances, the authorities favor the right of the defendant to offer evidence of previous threats and acts of aggression against him by the plaintiff to prove that the plaintiff was the aggressor.

The defendant testified that after the assault made on him by the plaintiff in Plattsmouth in 1949, the plaintiff's conduct toward him was of a disagreeable and hostile nature, and that he was afraid of the plaintiff, that is, afraid that he might carry out the threat that he made at that time, and that the plaintiff, while both were working in their respective fields, showed a disposition to start trouble during the intervening years up to the time of the assault.

As stated in 4 Am. Jur., Assault and Battery, § 153, p. 198: "Evidence of previous threats to commit an assault and battery are admissible on a trial involving an assault or assault and battery, provided the threats were made in such a manner and at such a time as to have a direct bearing on the assault in question. * * *

"Where the defendant pleads self-defense, he may show that the prosecutor had made threats against him, for the purpose of proving that he committed the assault and battery under the reasonable belief that unless he acted promptly the prosecutor would inflict grievous injury on him. But before a person is justified in making an attack or inflicting bodily harm upon a person who has made threats against him, however well grounded his apprehension may be, there must be some overt act from which may be reasonably inferred an intention to carry into effect his threats of personal violence. Hence, the only effect that previous remote threats can have is to give character to an overt act on the part of the person who made the threats and to justify the other in acting more promptly in self-defense than would have been permitted had no threats been made."

In Galbraith v. Fleming, 60 Mich. 403, 27 N. W. 581, the court said: "He (defendant) had a right to place before the jury the character of the plaintiff as he knew

it to be; to show him to be a high-tempered, quarrelsome, fighting man, whose anger and spite towards defendant had before led him to do exactly what defendant then feared he was about to do. The defendant had a right to act upon his honest belief, and upon the circumstances as they appeared to him. His actions were to be judged from the transaction as it appeared to him, and the jury could only determine this by knowing of the plaintiff what the defendant knew as to his disposition and temper towards him. * * * The jury were instructed that this evidence could not be used in mitigation of damages, but might be considered in determining whether the plaintiff was the attacking party, or whether the defendant believed that he was in danger of an attack from the plaintiff."

In Peterson v. Toner, 80 Mich. 350, 45 N. W. 346, it was held that for the purpose of showing plaintiff's malice toward defendant and in making an assault on the defendant, the defendant may introduce evidence of threats made against him by the plaintiff 3 or 4 years before the assault. It was apparent in this case that the plaintiff and defendant had had difficulty on different occasions running back over a period of 3 years and more. As to the former acts, the court said that the record offered two classes of proof on the subject. Evidence was offered to show by a witness the circumstances of a difficulty that occurred between the parties 3 years prior to the assault. This evidence was excluded. The court said that the circumstance inquired about was not more remote than had been allowed by the court, citing cases.

In Lambrecht v. Schreyer, 129 Minn. 271, 152 N. W. 645, L. R. A. 1915E 812, it was said: "The court received in evidence threats of violence made by defendant toward plaintiff two years and four months before the occurrence out of which this cause of action arose. Such evidence was admissible. The lapse of time was such that the probative force of the testimony may have

been little, but this goes to the weight of the testimony, not to its admissibility. State v. Hoyt, 46 Conn. 330; Keener v. State, 18 Ga. 194, 63 Am. Dec. 269; Commonwealth v. Quinn, 150 Mass. 401, 23 N. E. 54; Peterson v. Toner, 80 Mich. 350, 45 N. W. 346." See, also, Marshall v. Glover, 190 Ky. 113, 226 S. W. 398.

Instruction No. 11 presented to the jury issues solely concerned with matters within the actual knowledge of the defendant, that is, the previous violent conduct of the plaintiff toward the defendant and the information of the defendant touching the violent disposition of the plaintiff, and relates to previous conduct between the plaintiff and defendant and their relationship with each other, upon which there is a great amount of testimony.

The evidence offered by the defendant did not attempt to prove the general character of the plaintiff. What the defendant endeavored to prove was the plaintiff's violent conduct toward him and the continuing exhibition of a violent disposition toward him. This evidence was for the purpose of establishing the plaintiff as the aggressor in the fight in which the plaintiff received his injuries, and also to establish the defendant's state of mind, to disclose that he had good cause to be apprehensive of the plaintiff, and the force used by him to defend himself.

In McClure v. Shelton, 29 Neb. 370, 45 N. W. 689, the action was one of assault. The defendant's answer was a plea of justification. The assault occurred in 1887. In 1886, the plaintiff and defendant had an altercation in which the court was led to infer that the plaintiff was the aggressor. The court stated that this difficulty seemed to have been the source of the quarrel in the case at bar. Instruction No. 11 given by the trial court in the instant case is taken verbatim from McClure v. Shelton, supra, wherein it was approved. See, also, Miller v. Olander, 133 Neb. 762, 277 N. W. 72.

The plaintiff also contends that evidence of the specific act of assault and battery made upon the defendant

by the plaintiff in November 1949 and of the threat made by the plaintiff to the defendant was inadmissible. If prejudice could have resulted, it was cured when the plaintiff put the question of previous difficulties between himself and the defendant into evidence by the deposition of his deceased wife. We have heretofore related a part of this evidence. The trial court permitted this evidence to be introduced under the rule that when one party gives evidence on a specific issue, the opposing party's evidence to the contrary is admissible on the same issue. See, Falkinburg v. Prudential Ins. Co., 132 Neb. 831, 273 N. W. 478; Scott v. Prudential Ins. Co., 203 Minn. 547, 282 N. W. 467.

In Albertson v. Chicago, M., St. P. & P. R. R. Co., 242 Minn. 50, 64 N. W. 2d 175, 42 A. L. R. 2d 1044, it was held error to exclude defendant's testimony on an issue as to which plaintiff had introduced evidence. The court held: "Where a plaintiff is permitted to give evidence on a specific issue, defendant's evidence to the contrary is admissible on the same issue."

The assignments of error made by the plaintiff which are discussed above cannot be sustained.

This brings us to the plaintiff's contention that the trial court erred in permitting the defendant to testify to a conclusion, which invaded the province of the jury.

This is the question propounded to the defendant: "During this fight did you use any more force than you thought was necessary to defend yourself?" To which there was an objection as calling for a conclusion of the witness and invading the province of the jury, not a statement of fact. This objection was overruled. The answer was: "No, I did not."

One of the ultimate facts to be determined by the jury, when the defense in an assault and battery case is self-defense, is whether the defendant used more force than was reasonably necessary to defend himself. In the instant case the defendant was not asked whether he used more force than was necessary to defend him-

self or whether he used more force than was reasonably necessary. The question asked was whether the defendant used more force than he "thought" was necessary. The question was directed to the defendant's state of mind during the fight. The record discloses other statements made therein by the defendant that he tried to keep the plaintiff from doing him harm was all; that he struck the plaintiff so that he could not get the tools he was trying to get with which to beat the defendant; and that defendant was fighting to keep the plaintiff from hurting him, and when he quit, the defendant was glad to quit. Considering these statements, it is testimony to the effect that the defendant thought he was using only such force as was necessary to defend himself. These statements were brought out on cross-examination of the defendant. The record also discloses that the defendant, during the fight, wanted to stop it, but the plaintiff refused. When the plaintiff indicated that he wanted to stop the fight, the defendant agreed and then the fight was over. Some of these statements were made by the defendant before and some after the asking and answering of the single question heretofore referred to. In view of all of the evidence on this point, on the numerous times the defendant said indirectly that he thought he used no more force than was necessary to repel the plaintiff, we find no prejudicial error in permitting the defendant to testify as he did. It was for the jury to believe the defendant or disbelieve him, and to determine whether or not the defendant had used more force than was reasonably necessary to defend himself under the circumstances.

For the reasons given in this opinion the verdict of the jury and the judgment entered thereon by the court should be, and are hereby, affirmed.

AFFIRMED.